UNDERHILL, District Judge,
concurring:
Although I agree that appellants’ sentences should be vacated and remanded for procedural error, the real problem is that those sentences are shockingly high. For that reason, I would reach the question of substantive reasonableness and would reverse on the merits.
In my view, the loss guideline is fundamentally flawed, and those flaws are magnified where, as here, the entire loss amount consists of intended loss. Even if it were perfect, the loss guideline would prove valueless in this case, because the conduct underlying these convictions is more farcical than dangerous. If substantive review of sentences actually exists other than in theory, it must be undertaken at least occasionally. This would have been *378 an appropriate case in which to do so, because it raises so starkly the problems with the loss guideline. Until this Court weighs in on the merits of the loss guideline, sentences in high-loss cases will remain wildly divergent as some district judges apply the loss guideline unquestioningly while others essentially ignore it. The widespread perception that the loss guideline is broken leaves district judges without meaningful guidance in high-loss cases; that void can only be filled through the common law, which requires that we reach the substantive reasonableness of these sentences.
Ordinarily, we review a sentence to determine whether there was a procedural error in a district court’s sentencing before we consider “the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard, taking into account the totality of the circumstances.” United States v. Rigas, 583 F.3d 108, 121 (2d Cir.2009) (internal quotation marks omitted). That approach is wholly appropriate in the vast majority of sentencing appeals. Nothing, however, “prevents us from reaching both the procedural and substantive reasonableness of the sentence in the course of an appeal where we find both types of error.” United States v. Dorvee, 616 F.3d 174, 182 (2d Cir.2010) (citations omitted). Indeed, addressing both procedural and substantive reasonableness in the same appeal can serve the interest of judicial economy. Id. It is also the only means of addressing systemic problems with the Sentencing Guidelines. In short, “because procedural error and substantive error are permeable concepts ... postponing the consideration of substantive reasonableness [can be] a mistake and a missed opportunity.” United States v. Stewart, 597 F.3d 514, 515 (2d Cir.2010) (Jacobs, C.J., concurring) (denying rehearing in banc).
Substantive review of sentences provides “a backstop for those few cases that, [even if] procedurally correct, would nonetheless damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law.” Rigas, 583 F.3d at 123 (citation and footnote omitted). Not surprisingly, we have only rarely held that a sentence is substantively unreasonable. E.g., Dorvee, 616 F.3d at 181, 184 (vacating “a within-Guidelines sentence”; “the amount by which a sentence deviates from the applicable Guidelines range is not the measure of how ‘reasonable’ a sentence is. Reasonableness is determined instead by the district court’s individualized application of the statutory sentencing factors” (citing Gall v. United States, 552 U.S. 38, 46-47, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007))). In sum, we will set aside a district court’s substantive determination of the appropriate sentence only “in exceptional cases where the trial court’s decision cannot be located within the range of permissible decisions.” United States v. Cavera, 550 F.3d 180, 189 (2d Cir.2008) (citation and internal quotation marks omitted). This is such a case.
The twenty-year sentences imposed on appellants are not merely harsh, they are dramatically more severe than can be justified by the crime the appellants committed. This was a clumsy, almost comical, conspiracy to defraud a non-existent investor of three billion dollars. That scheme never came close to fruition. During his first meeting with Thomas Re, Emerson Corsey described Magnolia International Bank and Trust as the central bank for scores of Native American governments, including the Yamasee Indian tribe, which a Wikipedia search would have revealed as a tribal confederation that was broken up and defeated early in the 18th century. See http://en.wikipedia.org/wiki/Yamasee. *379 It took only a brief Google search for Re and his associates to understand that the proposal “smelled” — which is why the appellants were recorded by Re for months before their arrest. At one point, Corsey provided Re with a certificate signed by John Juncal that listed CUSIP numbers for the T-notes; when Re shared the certificate with his colleagues, they responded by bursting into laughter. Even the terms of the proposed deal itself were laughable: the lender of three billion dollars would, according to the appellants, receive fourteen billion dollars in profit over five years. This scheme amounted to a series of absurd lies piled on top of even more absurd lies. Appellants’ conduct was not dangerous because they had absolutely no hope of success.
A single factor — loss, specifically intended loss — drove the Guidelines calculation, and a single section 3553(a) factor— deterrence — provided the basis for accepting the Guidelines recommended sentence. A district court may not presume that a sentence within the Guidelines range is reasonable. Cavera, 550 F.3d at 189. Although the District Court used the intended loss amount correctly for purposes of calculating the Sentencing Guidelines range, the Court erred by failing to dramatically discount that calculation when weighing the section 3553(a) factors against the totality of the circumstances of this case. This conspiracy to defraud involved no actual loss, no probable loss, and no victim. The scheme was treated as sophisticated, but could be more accurately described as a comedic plot outline for a “Three Stooges” episode. Because the plan was farcical, the use of intended loss as a proxy for seriousness of the crime was wholly arbitrary: the seriousness of this conduct did not turn on the amount of intended loss any more than would the seriousness of a scheme to sell the Brooklyn Bridge turn on whether the sale price was set at three thousand dollars, three million dollars, or three billion dollars. By relying unquestioningly on the amount of the intended loss, the District Court treated this pathetic crime as a multi-billion dollar fraud — that is, one of the most serious frauds in the history of the federal courts. See United States v. Parris, 573 F.Supp.2d 744, 753 (E.D.N.Y.2008) (collecting sentences for major securities fraud convictions).
The error of accepting intended loss as a proxy for the seriousness of this crime was “compounded by the fact that the district court was working with a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires.” Dorvee, 616 F.3d at 184. The loss guideline, like the child pornography guideline at issue in Dorvee, was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices. As such, district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides. See Kimbrough v. United States, 552 U.S. 85, 109-10, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007); see also United States v. Diaz, No. 11-Cr.-00821-2(JG), 2013 WL 322243 at *3-7 (E.D.N.Y. Jan. 28, 2013) (expressing disagreement with Guidelines ranges for drug trafficking offenses because they are not based on empirical data and national experience).
The fraud guideline was initially set forth in Guideline section 2F1.1. The Sentencing Commission set the original 1987 Guidelines for economic offenses higher than historical sentences in order to further the deterrence and just punishment goals of sentencing. In 1989, in response to the savings and loan crisis, Congress passed legislation increasing the maximum *380 penalties for financial fraud offenses and directing the Sentencing Commission to include specific offense characteristic enhancements in the fraud guideline. See Robert S. Bennett, et al., Taking it to the Banks: The Use of the Criminal Process to Regulate Financial Institutions, 109 Banking L.J. 28, 28-34 (1992). In 2001, the Sentencing Commission amended the Guidelines to combine the fraud, theft and embezzlement, and property destruction guidelines into a single guideline, section 2B1.1. That change was accompanied by the publication of a new loss table that had the effect of increasing offense level calculations, especially for high-dollar-value crimes. See U.S. Sentencing Comm’n, Report to the Congress: Increased Penalties Under the Sarbanes-Oxley Act of 2002 at 7 (2003). Most recently, the fraud guideline was amended in 2003 in response to Congressional directives in the Sarbanes-Oxley Act. Id. Those amendments included further changes to the loss table that added offense level points in the highest loss cases. U.S.S.G. app. C amend. 647 (Nov. 1, 2003). The three sets of amendments to the loss table of the fraud guideline alone have effectively multiplied several times the recommended sentence applicable in 1987 for large-loss frauds, which itself was set higher than historic sentences. Each of the three increases in the recommended Guideline ranges for fraud crimes was directed by Congress, without the benefit of empirical study of actual fraud sentences by the Sentencing Commission.
The history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline’s advice to sentencing judges. As a well-known sentencing commentator has put it, “For the small class of defendants ... convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense. Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges.” Frank O. Bowman, III, Sentencing Highr-Loss Corporate Insider Frauds After Booker, 20 Fed. Sent’g Rep. 167, 168 (2008).
When the Guidelines range zooms off the sentencing table, sentencing judges are discouraged from undertaking close examination of the circumstances of the offense and the background and characteristics of the offender. That certainly happened here. But the low marginal utility of the guideline in this very high intended loss case should have prompted greater, not lesser, reliance on the section 3553(a) factors other than the Guidelines. As one District Court applying the loss guideline put it, “Where the Sentencing Guidelines provide reasonable guidance, they are of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable. But where, as here, the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences.” United States v. Adelson, 441 F.Supp.2d 506, 515 (S.D.N.Y.2006), aff'd mem., 301 Fed.Appx. 93 (2d Cir.2008).
In this case, it is impossible to describe the sentences imposed on appellants as substantively reasonable. In my view, none of the section 3553(a) factors, singly or in combination, can justify these shockingly high punishments, which are far greater than necessary 19 to punish or deter appellants’ conduct. The District Court provided “no reason why *381 the maximum sentence of incarceration was required to deter [the appellants] and offenders with similar history and characteristics.” Dorvee, 616 F.3d at 184. The bare assertion of the need to deter, unconnected to the background and characteristics of a defendant or the nature and circumstances of a crime, provides only superficial support for a sentence of imprisonment. Here, the factor of deterrence simply cannot “bear the weight assigned it under the totality of circumstances in the case.” Cavern, 550 F.3d at 191. None of the appellants had ever served a significant term of imprisonment and two of the three had spent no time in prison whatsoever. This raised the question whether a statutory maximum sentence is necessary to deter future wrongdoing. See United States v. Mishoe, 241 F.3d 214, 220 (2d Cir.2001) (counseling district courts to consider previous terms of incarcerations and calibrating new sentences to reflect prior time behind bars). That is especially true here because appellants are older than most defendants and, accordingly, can be expected to have a lower risk of recidivism than most. See U.S. Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines 16 (2004). Indeed, one of the appellants will surely die in prison, if required to serve a sentence anywhere close to twenty years; although an effective life sentence, by definition, provides complete deterrence, imposing such a sentence for the conduct underlying this conviction would be senseless.
The absence of any actual loss whatsoever and especially the absence of a victim significantly undercut any argument that this crime was particularly serious. Outside the context of Sentencing Guidelines calculations, intended loss is always less serious than actual loss, so its value as a proxy for seriousness of a crime must be carefully examined. And not all actual loss is equally serious. A fraud that results in the loss of even a few thousand dollars by an elderly or sick person who, as a result of the loss, becomes unable to afford the necessities of life or medical care is much more serious than a fraud that results in ten or a hundred times that loss by a large corporation able to absorb the financial consequences without a need to close plants, fire employees, or even declare the loss as material in public financial reports. Simply put, contrary to the assumption underlying the loss guideline, not all dollars of loss are fungible.
Moreover, the convictions in this case were for conspiracy, which proscribes an agreement to commit fraud and punishes that agreement the same whether or not a fraud was actually committed. “[W]e punish unconsummated efforts to cause harm as ‘attempts’ or ‘conspiracies’ (albeit usually less severely than completed crimes) so long as the would-be-perpetrator has come close enough to success that we can be confident his malignant designs were real and not mere fantasy, and thus that his conduct was morally blameworthy.” Frank O. Bowman, III, Coping with ‘Loss’: A Re-examination of Sentencing Federal Economic Crimes Under the Guidelines, 51 Vand. L.Rev. 461, 559 (1998). The circumstances of these convictions put them very close to the boundary of mere fantasy (or perhaps the boundary of mental competence) and the sentences should have reflected that fact. As with most attempt crimes and unconsummated conspiracies, the actual loss here was zero. The wrongfulness of the appellants’ conduct does not turn in any meaningful sense on the amount that the conspirators sought to obtain; all other things equal, an effort to secure $3 billion for construction of an imaginary pipeline is not 100 times as serious as an effort to secure $30 million for construction of an imaginary factory. Accordingly, factors other than intended loss *382 become critical in distinguishing the seriousness of unconsummated criminal conduct.
District judges are not permitted to treat the Sentencing Guidelines as reasonable. Cavera, 550 F.3d at 189. The corollary of that proposition is that district judges have an obligation to consider whether a sentence other than a Guidelines sentence would be sufficient, but not greater than necessary, to serve the purposes of sentencing. 18 U.S.C. § 3553(a). Accordingly, district judges have an obligation to consider whether to depart from the Guidelines sentencing range or to impose a non-Guidelines sentence in every case. That duty will frequently require judges applying the loss guideline to evaluate whether the calculated Guidelines range substantially overstates the seriousness of a crime. See U.S.S.G. § 2B1.1 application note 19(C) (“There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted.”). That duty went unfulfilled in this case, and the result was the imposition of shockingly high sentences on the appellants.
The Court of Appeals missed an opportunity in this case to provide much needed guidance to district judges who must apply the misguided loss guideline. Thankfully, the District Court will have the opportunity at resentencing to undertake the difficult task of weighing all of the section 3553(a) factors under the circumstances of these cases to reach sentences that are sufficient, but not greater than necessary, to serve the purposes of sentencing.